Good morning, Your Honors. May it please the Court, my name is Howard Davis. I represent the petitioner Ricky Belfast Nababan. And I'd like to have about two minutes for rebuttal. You know, I had my ears checked and my hearing's just down a little bit. The doctor said it was just fine and I just have trouble hearing. Okay, I will try to speak up. I speak in a lower register. I'd like to first start off with the words cited by the respondent on page 12 of the brief from Abebe v. Gonzalez. And I find them helpful for the petitioner. We take the board at its word and do not assume that the board meant something other than what it said. And so in this particular case, let's take the board at its word. And in this ‑‑ and we're asking the Court here to remand to the board for it to clarify its analysis as to the petitioner's claim for asylum and cat. And the board in its decision, in its analysis, only used the analysis for withholding. And even though in the end it concluded that the ‑‑ Counsel, can you just clarify for me? Yes. I just understood you to say that you're asking us to remand to the BIA to clarify its analysis? Is that what you said? It's ‑‑ it dismissed the petitioner's appeal for asylum and cat. Right. And it used a withholding standard to make its decision. So you're asking us to find that as a matter of law. Yes. The BIA erred, and therefore we should send it back. But there's not ‑‑ you're not ‑‑ it's not some new motion, a motion for clarification. No, it is not. And if I confuse the Court in the way that I apologize, but ‑‑ Where's the BIA's error? Turning to page ‑‑ well ‑‑ You're talking about the February 15th, 2008 order? Yes. Okay. It is February 15th, 2008 order. And in the very last paragraph, which is on page 4 of the administrative record, it says, under these circumstances we find no reason to disturb the IJ's denial of the Respondent's applications for asylum, withholding, removal, and for cat. Now, when one takes a look at under these, what are these circumstances, one takes a look at what was the analysis that the board ‑‑ how did the board get to that point? Counsel, under Lopez, isn't the board deemed to have adopted the analysis of the IJ to the degree that it's not explicitly stated? Well, but that's the ‑‑ but what ‑‑ but the problem here is that the only thing that the board has explicitly stated that it agreed with the IJ is ‑‑ has to do with the withholding of removal. If I turn to the middle of page 3 of the administrative record, after the first page and a half, where it just kind of recites the history, so then we finally get to the analysis. So in the middle ‑‑ in the third paragraph, it says, initially, we concur with the immigration judge's conclusion that the Respondent failed to establish that his life or freedom would be threatened in the future based upon his Christianity, which is ‑‑ which is words that pretty much track the withholding statute. Okay. What about the previous paragraph? The previous paragraph, it just said what the ‑‑ what Ravabon did on appeal, and it just recites his arguments. But it does not specifically say that it concurs with the judge on everything. This is not a Bourbon type case where, you know, it's to the board just adopts the IJ's decision completely, and it's not affirmed without opinion. But, again, under Lopez, I'm just quoting here, the BIA does not have to write an exegesis on every contention. But ‑‑ But the problem here is that the petitioner challenged the judge's decision on asylum withholding in CAD. And this ‑‑ we're not saying that in this ‑‑ at least in this aspect of my argument here, that, you know, there are certain things that the judge does not agree with. I'm not saying that the board didn't pick up on the record. What we're saying is that the law that had applied, that the legal framework in which it looked at the asylum ‑‑ But it's pretty clear that the BIA was aware of the framework. That's what's found in paragraph 2 where it talks about suffering future persecution. Footnote 2 says the Respondent made no claim of past persecution. Right. So the only thing that it could be looking for is evidence of future persecution, which is addressed in paragraph 3. But future persecution is something that is relevant for both withholding and for asylum. Right. It did recite the words future persecution in paragraph 3 on page 2 that I can see. But it did say that his life or freedom would not be threatened in the future. And it has recited the statute or the standard elsewhere in the opinion. And that's fine. And that's fine with regard to withholding. So I'm not ‑‑ I'm not saying ‑‑ I'm not talking about withholding. With regard to withholding, they mention withholding. But withholding has a much higher ‑‑ has a much higher standard with regard to future risk of harm. It's more likely than not versus a well‑founded fear of 10 percent. It has used the words future persecution in that third paragraph that you've been pointing to. As a result, the Respondent could reasonably avoid future persecution by living in parts of Indonesia where there's minimal risk of tax against Christians. Right. And then what does the board do is that it then cites to the withholding regulation, 1208.16. That's withholding. It's ‑‑ there's nothing that goes specifically to the asylum case. And then ‑‑ and then ‑‑ No, but the BIA did refer to the IJ's decision that sets out the proper standard. But it didn't ‑‑ but the board did not specifically adopt that in the recital of what happened. No. Can I tell you something? There's a friend of the Court in your time. Pardon me? You've got another argument. Write that down. You're wasting your time on that argument. Yeah. You're wasting your time on that argument. But, Your Honor, but I'm asking the Court only to apply its decision in a preeding. I know. But we got your point. But, you know ‑‑ You've got another argument? We've got another argument. Well, that was my ‑‑ that was my main argument. I mean, there are other ‑‑ the same thing is actually said about CAP. That's my same argument with regard to CAP. You're not really taking the BIA on? You're not really taking the BIA's decision on on the merits. All you really want is to send us ‑‑ is for us to send it back to the BIA to have them recite the appropriate standard. Well, I'm asking to have them do the appropriate ‑‑ Part of the BIA's opinion here, is there any ‑‑ is there any question in your mind as to what the BIA is going to decide when we send this back to them? I don't think there's any question in our minds. But that's not before this Court. What's before this Court is the record as it is. We're taking a look at what did the Board do. And so that's ‑‑ it's what the Board did. Again, this is not ‑‑ Well, the last ‑‑ the next to the last paragraph of the Board's decision under these circumstances, we find no reason to disturb the immigration judge's denial of the Respondent's application for asylum, withholding of removal under the Act, or protection under the Convention of Human Rights. Right.  Well, circumstances also include all of the facts that the Board recited on pages 1 and 2. But the thing is, is that ‑‑ but the legal framework that it applied was ‑‑ The BIA, I think, is very, very well aware. We get 4,000 to 6,000 cases a year from the BIA dealing with these issues. We know that the Board knows what the standard is. This is a routine ‑‑ there's nothing novel about the legal arguments here other than the facts. So, I mean, the legal framework is not really in question. There's nothing novel here. But the problem is, is that they did not convey that in this decision. And it's this decision. If this had been Bourbono, I wouldn't be having this conversation. But this is not Bourbono. And they did what they did. You can say the same thing in a free‑d. It's a good thing you're not in the Senate, because you don't know how to count votes. I was hoping ‑‑ yes, I understand that there are three people. If you want miracles, you've got to go some other place. But there's a lot of ‑‑ I heard a case about a rosary yesterday. There's a lot of bad things that happen in this case. But I'm not asking anything different than what the court did in a free‑d. Here's this boy, Ricky, right? Yes. He's there. And he's in court with his lawyer, not you, the other guy. Is that right? Yes. And he's there with his father. And the cases are severed, right? Yes. And the guy goes along with it, right? Yes. If they had not been severed, we wouldn't be here today, would we? Huh? Because his father got asylum, and Ricky would have gone along. Well, his father got asylum because he was a derivative of the wife, and by the time that the father married the wife, he was too old for a stepchild definition under 101. Well, I know, I know, I know, but he shouldn't have been severed. Well, that ‑‑ Well, aren't you listening to me? Yes, I am, Your Honor. Yeah, because I think you probably got a pretty good claim for ineffective assistance of counsel. And then the lawyer goes in there and waives his voluntary departure, right? Isn't that what he did? He just gave that away for nothing, which means that he can't come back here for a long, long, long time. And you have an immigration judge there that watches all this go on, and then this lawyer, he goes along with continuing the case to a time when Ricky is then 21. Did that happen? Well, he did turn to ‑‑ I mean, do you know what's in this file? Yes, I do. Yeah, that happened. And the immigration judge just lets that pass. And it's the immigration judge's duty to see that every person that appears there gets a fair trial. And immigration judges know that a large percentage of lawyers that appear before them are of marginal competence. And a big number, you know, fall off the wrong side of the fence. That didn't ‑‑ you didn't think about that, did you? Your Honor, I'm at the Ninth Circuit. I can work only with the administrative record. What? I'm at the Court of Appeals. I can only work with the administrative record that I have in front of us. Well, that's a good thing to hear that. That's in the record. And that's why I'm arguing. I mean, it's a ‑‑ It is not often that a side gets the distinguished help from the presiding judge of a circuit judge panel to help write a brief for another case. You've just gotten it. You have just gotten it. That's good. Yeah, I don't know if you're the guy to write the brief. But, you know, there was a lot of stuff in the record that was totally ignored. And it's ‑‑ you know, when the BIA ignored the evidence in the record and found that Ricky could avoid persecution by relocating somewhere else within Indonesia. You know about that? Yes. There's a whole bunch of stuff here. Write that down. Yeah, write that down here. And if you like, you can come over here and read my notes. But anyway, I'll put some of it in the record here. All right. Now, where's the government? Did we talk to them? Right here. This guy is ‑‑ I would echo Judge Ferguson's comment that you've been in this long enough. You know how the votes can be counted. And you don't need to spend a whole lot of time. I was about to make my appearance, Your Honor. Jeffrey L. Mankin, United States Department of Justice for the Attorney General. I had some prepared remarks. But in light of changed circumstances, I'm prepared to submit. Well, what are you going to tell us? In the confusion, Your Honor, I've forgotten. Did they send you out here on Air Force One? I saw a film on it yesterday. The plane had United on the side, but not the rest of it. United States, yeah. Thank you, Your Honor. Okay, thank you. All right. Now we come to three. Chen versus Neapolitano. What year is it? I'm sorry.
judges: Pregerson, Bybee, Smith M.